# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## STATESVILLE DIVISION
## 5:23-cv-196-MOC

| | |
|---|---|
| WENDELL JUDE LEMAITRE,      ) | |
| ) | |
| Plaintiff,      ) | |
| ) | **MEMORANDUM OF** |
| vs.      ) | **DECISION AND ORDER** |
| ) | |
| DAVID L. PARLIER, et al.,      ) | |
| ) | |
| Defendants.      ) | |
| ) | |

**THIS MATTER** is before the Court on the Defendants' Motion for Summary Judgment [Doc. 69].

## I.    BACKGROUND

The Plaintiff filed this action pursuant to 42 U.S.C. § 1983 addressing incidents that allegedly occurred at the Alexander Correctional Institution.[1] The Plaintiff's verified Amended Complaint passed initial review against David Carroll, a sergeant, and David L. Parlier, a correctional officer, for the use of excessive force/ failure to intervene and retaliation.[2] [Doc. 51: Am. Compl.; Doc. 50: Order on Initial Rev.]. The Plaintiff seeks a declaratory judgment, compensatory and punitive damages, any other appropriate relief, and a jury trial.[3] [Doc. 1 at 5].

The Defendants filed a Motion for Summary Judgment and supporting materials. [Doc. 69: MSJ; Doc. 70: MSJ Memo, Exhibits; Doc. 73: Sealed Exhibits; Doc. 7:5 Order re Manually Filed

---

[1] The Plaintiff's current address of record is at the Pender Correctional Institution.

[2] The original Complaint is verified and it also passed initial review on several claims. [See Docs. 1, 7].

[3] Plaintiff's request for a declaratory judgment is moot insofar as the Plaintiff no longer resides at the Alexander CI and the incidents at issue are unlikely to recur. See Incumaa v. Ozmint, 507 F.3d 281, 286-87 (4th Cir. 2007).

Video]. Thereafter, the Court entered an Order in accordance with <u>Roseboro v. Garrison</u>, 528 F.2d 309 (4th Cir. 1975), advising Plaintiff of the requirements for filing a response to the summary judgment motion and of the manner in which evidence could be submitted to the Court. [Doc. 76: <u>Roseboro</u> Order]. The Plaintiff filed a Response and supporting materials including Declarations by Plaintiff and several other individuals who were incarcerated at the Alexander CI with the Plaintiff.[4] [Doc. 88: Response, Exhibits]. These matters are ripe for disposition.

## II. STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). A fact is material only if it might affect the outcome of the suit under governing law. <u>Id.</u>

The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." <u>Id.</u> at 322 n.3. The nonmoving party may not rely upon mere allegations or denials of allegations in his pleadings to defeat a motion for summary judgment. <u>Id.</u> at 324. Rather, the nonmoving party must oppose a proper summary judgment motion with citation to "depositions, documents, electronically stored

---

[4] The Court will also consider the Plaintiff's verified Complaint s a forecast of evidence. <u>See</u> <u>Goodman v. Diggs</u>, 986 F.3d 493 (4th Cir. 2021) (a verified complaint is the equivalent of an opposing affidavit on summary judgment).

information, affidavits or declarations, stipulations …, admissions, interrogatory answers, or other materials" in the record. See id.; Fed. R. Civ. P. 56(c)(1)(a). Namely, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. To that end, only evidence admissible at trial may be considered by the Court on summary judgment. Kennedy v. Joy Technologies, Inc., 269 F. App'x 302, 308 (4th Cir. 2008) (citation omitted).

When ruling on a summary judgment motion, a court must view the evidence and any inferences from the evidence in the light most favorable to the nonmoving party. Anderson, 477 U.S. at 255. Facts, however, "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380, 127 S.Ct. 1769, 1776 (2007). As the Supreme Court has emphasized,

> "[w]hen the moving party has carried its burden under Rule 56(c), the opponent must do more than simply show there is some metaphysical doubt as to the material facts …. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-28, 106 S. Ct. 2505 (1986). When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.

Scott, 550 U.S. at 380.

## III.    FACTUAL BACKGROUND

The forecast of evidence in the light most favorable to the Plaintiff shows the following.

### A.    Incidents

3

On September 29, 2021, Defendant Parlier escorted Plaintiff to the shower, returned to Plaintiff's cell and ransacked it while Plaintiff was showering, then walked away, laughing.[5] [Doc. 51: Am. Compl. at ¶ 7-9; see Doc. 88-1: Exum Decl. at 2]. Plaintiff summoned the sergeant on duty and made a verbal complaint that Parlier had left his cell in disarray. [Id. at ¶ 10]. Plaintiff asked that the sergeant deliver Plaintiff's breakfast tray the next morning, because he feared that Parlier would retaliate against him for complaining to the sergeant. [Doc. 51: Am. Compl. at ¶ 11]. In the middle of the night, Parlier woke the Plaintiff by tapping on his cell door, and said that Parlier, and not the sergeant, would be delivering Plaintiff's breakfast tray; this kept the Plaintiff up for the rest of the night. [Id. at ¶ 12].

The next morning, Parlier delivered a breakfast tray that was contaminated with hair shavings, which the Plaintiff did not eat; and he pointed his mace at the Plaintiff and called him a snitch.[6] [Id. at ¶¶ 14-15; Doc. 88-1: Exum Decl. at 4]. Parlier provided a replacement tray that was also contaminated. [Doc. 51: Am. Compl. at ¶¶ 19, 21]. The Plaintiff complained about Parlier's conduct to several staff members. [Id. at ¶¶ 16-19, 28, 31; Doc. 88-1: Exum Decl. at 5-6].

On October 1, 2021, Parlier again ransacked Plaintiff's cell while Plaintiff was in the shower, squeezed and embedded his fingernails in Plaintiff's arm, and used disrespectful language.[7] [Doc. 51: Am. Compl. at ¶ 35]. During the following several days, Parlier disrupted Plaintiff's sleep, called him names, and made comments about Plaintiff's food.[8] [Id. at ¶¶ 36-39].

On the morning of September 2, 2022 Parlier and Carroll assisted with a periodic facility search conducted by the Prison Emergency Response Team ("PERT"). [Doc. 70-12: Carroll Decl.

---

[5] Parlier denies searching or ransacking Plaintiff's cell in September 2021. [Doc. 70-13: Parlier Decl. at ¶ 20].

[6] Parlier denies knowing of Plaintiff's grievances or complaints until after September 2, 2022. [Doc. 70-13 at ¶ 18].

[7] Parlier denies searching or ransacking Plaintiff's cell in October 2021. [Doc. 70-13 at ¶ 20].

[8] Parlier denies tampering with Plaintiff's food or using abusive language. [Doc. 70-13 at ¶ 21].

4

at ¶ 7]. Plaintiff's was one of the first cells to be searched because he was considered high risk due to his history of assaulting and threatening staff. [Id. at ¶ 10]. As Parlier and Carroll approached Plaintiff's cell, Parlier said that he was going to "tear his sh** up." [Doc. 88 at 5: Plaintiff's Decl. at ¶ 15; Doc. 88-6: Eubanks Decl. at ¶ 7]. Parlier ordered Plaintiff to submit to a complete search, using profane language. [Doc. 51: Am. Compl. at ¶ 41]. Plaintiff asked Carroll to replace Parlier with another officer due to Plaintiff's past problems with Parlier; this was denied. [Id. at ¶ 43; Doc. 68: Plaintiff's Decl. at ¶ 16; Doc. 88-6: Eubanks Decl. at ¶ 8]. Plaintiff eventually removed his shirt which Parlier snatched and tossed to the floor.[9] [Doc. 51: Am. Compl. at ¶ 47]. The Plaintiff told Carroll that he was not going to accept further treatment from Parlier and Parlier became more aggressive, yanking his handcuffs from the holster and ordering Plaintiff to come cuff up. [Id. at ¶ 19]. Carroll pulled out his mace and threatened to spray Plaintiff if he did not submit to cuffs. [Id. at ¶ 52]. The Plaintiff eventually complied and faced the wall for handcuffing.[10] [Id. at ¶ 56].

Parlier banged his handcuffs around Plaintiff's wrists, squeezing tightly.[11] [Id. at ¶ 57]. Plaintiff attempted to inform Parlier and Carroll of his severe pain from the extremely tight cuffs. [Id. at ¶ 59]. They escorted Plaintiff out of the unit.[12] [Doc. 70-12: Carroll Decl. at ¶ 13]. In the hallway, they ignored Plaintiff's pleas to loosen the cuffs. [Doc. 51: Am. Compl. at ¶ 62].

Parlier, Carroll, and the Plaintiff entered an elevator where Parlier made disrespectful

---

[9] According to Parlier, Plaintiff threw the shirt at him. [Doc. 70-13 at ¶ 11].

[10] The Court need not accept Plaintiff's statement that Parlier prevented him from complying with orders to exit the cell by repeatedly shoving his chest, because such is conclusively refuted by the video footage. [Doc. 51: Am. Compl. at ¶ 20; see C124 Green North Housing video at 9:40:00-9:40:20].

[11] The Court need not accept Plaintiff's statement that Parlier cuffed him with his palms facing outward, because such is conclusively refuted by the video footage, which shows his palms facing upward and somewhat towards each other. [Doc. 51: Am. Compl. at ¶ 57; C95 Blue Elevator video at 09:42:48].

[12] The Court need not accept Plaintiff's statements that the Defendants snatched him aggressively from the wall and speed-walked, making Plaintiff trip, while dragging him in opposite directions, because such is conclusively refuted by the video footage. [Id. at ¶¶ 59-60; C124 Green North Housing video at 9:40:46-9:41:05].

5

remarks.[13] [Id. at ¶ 64]. Plaintiff continued pleading for the cuffs to be loosened. [Id. at ¶¶ 68-69].

Plaintiff called for help as the escort passed a medical room. [Id. at ¶ 71]. Nurses ordered Plaintiff to be seen and he was brought into the medical room, however, Carroll refused to remove the cuffs for an examination due to officer safety concerns and "inmate behavior."[14] [Id. at ¶¶ 73-76; Doc. 88-9 at 1 (Carroll Statement)]. Carroll yanked Plaintiff off of the medical examination table, causing extreme pain, and escorted him to restrictive housing. [Doc. 51: Am. Compl. at ¶ 76]. Plaintiff made verbal and written complaints to a visiting captain about Carroll and Parlier's actions. [Doc. 88: Plaintiff's Decl. at ¶ 22].

The Plaintiff was found guilty threatening to harm/injure staff (B18) and disobeying an order (B25). [Doc. 70-12: Carroll Decl. at ¶ 15].

On September 28, 2022, Parlier placed, then snatched away, Plaintiff's breakfast tray. [Doc. 51: Am. Compl. at ¶¶ 78-79]. On October 10, 2022, Plaintiff requested protected custody due to Parlier's continuous misconduct and Carroll's actions; his request was denied after an investigation. [Id. at ¶¶ 80-81]. Parlier cursed at Plaintiff on December 29, 2022. [Id. at ¶ 83].

Parlier transferred to another facility in February 2023. [Doc. 70-13: Parlier Decl. at ¶ 3].

On April 16, 2023, Plaintiff was in the dayroom when he approached offender Anthony Burnette and asked him to relay a message to Plaintiff's family over the phone. [Doc. 88-16: Burnette Decl. at ¶ 3]. Burnette agreed and Plaintiff began looking for a small piece of paper with his family's phone number on it. [Id. at ¶ 4]. Plaintiff realized that the paper might be in his pants pocket, folded up on the shower wall, so he and Burnette went to the shower area where Plaintiff

---

[13] The Court need not accept Plaintiff's statement that Parlier leaned his body against Plaintiff's buttocks in the elevator, because such is conclusively refuted by the video footage. [Doc. 51: Am. Compl. at ¶ 66; C95 Blue Elevator video at 09:42:04-9:42:48].

[14] The Court need not accept Plaintiff's contention that he did not break any rules and was never aggressive or non-compliant, because he admits ignoring several orders. [Doc. 51: Am. Compl. at ¶ 77; id. at ¶¶ 42, 45, 48].

retrieved the paper and handed it to Burnette. [Id. at ¶ 4]. Burnette went to the phone and was making a call when he was summoned to the hallway by Officer Stamper.[15] [Id. at ¶ 5]. Burnette was pat-searched and he explained to Carroll that Plaintiff gave him a phone number. [Id. at ¶ 8].

Carroll then ordered Officer Stamper to pull Plaintiff into the hallway, where Plaintiff was pat-searched. [Id. at ¶ 9; Doc. 51: Am. Compl. at ¶¶ 88, 92-93]. Plaintiff explained that he only gave Burnette a phone number. [Id. at ¶ 96]. An officer retrieved a small piece of paper from Burnette's pants pocket. [Id. at ¶ 97].

Carroll went into the block and returned a short time later with a medication bottle, which Burnette claimed as his. [Id. at ¶¶ 98-99; Doc. 88-16: Burnette Decl. at ¶ 9]. However, medical staff informed officers that the medications in the bottle were prescribed to Plaintiff. [Doc. 70-12: Carroll Decl. at ¶ 18; see Doc. 70-10: MSJ Ex at 8 (April 16, 2023 Statement of Yutokia Lipford)].

The Plaintiff complained that Carroll was harassing him, and stated that he would be filing a grievance.[16] He was sent to restricted housing,[17] and he was charged with a disciplinary infraction for misuse of medication. [Doc. 51: Am. Compl. at ¶¶ 111; see Doc. 70-12: Carroll Decl. at ¶ 19]. The infraction was dismissed for a time-limit violation. [Doc. 70-10 at 1 (Offense and Disciplinary

---

[15] Officer Stamper is not a defendant in this case.

[16] The Plaintiff has presented several versions of these events. [Doc. 88: Plaintiff's Decl. at ¶¶ 25-26 (Carroll summoned Plaintiff to the hallway and had him frisked, then sent him to restricted housing within "seconds" of saying that he would be filing a grievance for harassment); Doc. 1: Compl. at ¶¶ 68-73 (Plaintiff was released from the hallway despite saying that he would file a grievance for harassment, he mentioned a grievance for a second time before re-entering the block, he was called back to the hallway 10-15 seconds later, Carroll ordered Plaintiff to be locked up, and he was handcuffed and taken to restricted housing); Doc. 51: Am. Compl. at ¶ 101-08 (Plaintiff was released from the hallway after complaining of harassment, Plaintiff said he would be filing a grievance as he entered the housing block, Plaintiff was called back to the hallway 30-45 seconds later, he was placed against the wall for "running his mouth," Carroll appeared deep in thought before sending him to restricted housing); see also Doc. 70-27 at 2 (Grievance No. 4870-2023-LOPDC-00937, claiming that Carroll instructed Plaintiff to go back to the pod after he was pat-searched and questioned; 20 seconds later, Guard Stanford called him back to the hallway and had him put his hands on the wall; after approximately 45 seconds, Plaintiff told Carroll that he would file a grievance about harassment; and Carroll immediately had Plaintiff handcuffed and sent to restrictive housing for 18 days)].

[17] The Plaintiff has presented inconsistent evidence regarding the length of time he remained in restricted housing. [See Doc. 51 at ¶ 116 (18 days); Doc. 1 at ¶ 80 (3 weeks)].

7

Report dated April 24, 2023, and signed April 27, 2023)]. Plaintiff's mental health deteriorated from the incidents, requiring medication. [See Doc. 51 at ¶ 119; Doc. 1 at ¶ 84, 86-89].

**B.      Medical Records**

As of July 7, 2022, the Plaintiff verified that he health conditions including: "Traumatic arthropathy, unspecified site;" "PAIN IN LEFT WRIST;" and "BILATERAL AND PAIN IN LEFT HAND." [Doc. 73-2 at 6 (July 15, 2022 ADA Determination)].

On September 2, 2022 at 9:52 a.m., the Plaintiff saw a nurse for complaints that "[t]hey put these cuffs on to [sic] tight, I can't move my hand," with pain and numbness in his left wrist in inhibited range of motion. [Doc. 73-2: Med. Records at 11 (9/2/22 Clinical Encounter by Caroline Bradshaw, LPN)]. The Plaintiff appeared to be in pain and there was a "visible injury," i.e., "red marks to the left wrist…" which was "tender to the touch."  [Id. at 12].  Plaintiff was given ibuprofen and was told to follow up at sick call as needed. [Id.]. Two days later when Plaintiff was seen for an unrelated medical issue, he was in no distress and had no visible pain or physical injury. [Doc. 73-2 at 14 (Sept. 4, 2022 16:57 Clinical Encounter); Doc. 73-2 at 16 (Sept. 4, 2022 10:30 Clinical Encounter)]. Medical encounters on September 6, 7, 9, 12, 16, 20, 23, and October 3, 19, 2022, make no mention of wrist or hand pain. [Doc. 73-2 at 13-39].

On October 24, 2022, the Plaintiff was seen for complaints of pain in several joints as follows:  "Left wrist, Right shoulder, right ankle = remote injuries. Wrist = [about] several mo ago, with assoc numbness and tingling…." [Doc. 73-2 at 40 (10/24/22 clinical encounter)]. The Plaintiff had left wrist/hand tenderness and decreased range of motion. [Id. at 41]. He was prescribed medication and x-rays, and was instructed to follow up at sick call as needed. [Id. at 42]. The x-ray of his left wrist found no acute abnormalities. [Id. at 43 (Oct. 28, 2022 X-ray Report)].

The Plaintiff next complained of hand and wrist pain on December 8, 2023. [Doc. 88-21 at

8

35 (Dec. 8, 2023 sick call)]. On December 29, 2023, he stated that the pain began after handcuffs were placed too tightly on his wrists. [Doc. 88-21 at 31 (Dec. 29, 2023 notes)]. He continued complaining about pain and numbness. [Doc. 88-21 at 12, 25, 31, 33]. He was sent for an EMG test in June 2024, which was consistent with bilateral carpal tunnel. [See Doc. 88-21 at 13. 27 (June 19, 2024 EMG)]. At an outside orthopedic consultation in September 2024, the Plaintiff stated that he had bilateral numbness and tingling in his hands for the past year and a half. [Doc. 88-21 at 7 (Sept. 9, 2024 EmergeOrtho Report)]. He was diagnosed with bilateral carpal tunnel which was treated which injections and anti-inflammatory medication. [Id.]. Plaintiff is preparing to undergo surgery for nerve damage. [Doc. 88: Plaintiff's Decl. at ¶ 31].

C.     Grievances

Between January 2021 and June 2023, the Plaintiff exhausted 11 grievances, and 21 more were resolved or rejected.  [Doc. 70-16: Grande Decl. at ¶¶ 10-11; Doc. 70-28: Byrd Decl. at ¶ 8].

Plaintiff turned in a grievance addressing the improper search on September 29, 2021 and the breakfast tray and related incidents that followed to a unit manager on December 28, 2021. [Doc. 1: Compl. at ¶ 105; Doc. 70-34 (Grievance No. 4870-2022-LOPDC-00052)].  The grievance was "intentionally held onto" until January 7, 2022, after the 90-day time limit had expired. [Doc. 1: Compl. at ¶ 105]. The grievance was rejected on screening as untimely.  [Doc. 70-34 at 4].

The Plaintiff addressed Parlier's "campaign of harassment, retaliation & assault with injury" on September 2, 2022 in a grievance dated October 10, 2022. [Doc. 70-26 at 2 (Grievance No. 4870-2022-LOPDC-19397)]. The Plaintiff requested protective custody due to Parlier's conduct, including shoving him repeatedly back into the cell; banging handcuffs on his wrists; and squeezing the cuffs tightly, causing extreme pain. An investigation was conducted and it concluded that no further action was needed. [Id. at 4]. Plaintiff appealed, and the Step Two response

9

concluded that no further action was warranted. [Id. at 5]. The Step Three appeal was dismissed as lacking any supporting evidence. [Id. at 1].

The Plaintiff's witness statement regarding the September 2, 2022 incident included PREA allegations about Parlier's conduct in the elevator. [Doc. 73-1 at 5 (Plaintiff's statement)]. PREA investigations were conducted, finding no PREA violations. [See id. at 1 (Incident Reports)].

The Plaintiff addressed Sergeant Carroll's conduct on April 16, 2023 in a grievance dated May 14, 2023. [Doc. 70-27 at 2 (Grievance No. 4870-2023-LOPDC-00937)]. The Grievance was denied at Step One because the disciplinary was investigated and Plaintiff was treated fairly. [Id. at 4]. Step Two concluded that no further action was necessary because the disciplinary was dismissed due to time frame violations. [Id. at 5]. Step Three found no violation of prison policy or any evidence of disrespect or abuse of authority by staff. [Id. at 1].

**D.      Video Footage**

Footage from September 2, 2022 reflects the following events in the housing pod:

| | |
|---|---|
| 09:39:19 | Multiple PERT officers enter the housing pod. |
| 09:39:46 | Parlier and Carroll walk across the pod and stop in front of Plaintiff's closed cell door. |
| 9:39:55 | Plaintiff's cell door opens. |
| 9:39:58 | Plaintiff is visible in the doorway, apparently conversing with officers. |
| 9:40:00 | Plaintiff steps through the doorway, then back into the cell. Officer's hand is raised but not touching Plaintiff. |
| 9:40:09 | A third officer walks up to the cell doorway and partially blocks the view of the doorway. |
| 9:40:09 | Officer partially extends his left hand and a shirt falls to the floor while the officer's arm remains extended toward the cell door, static. |
| 9:40:20 | Plaintiff exits the cell. |

10

| | |
|---|---|
| 9:40:30 | Plaintiff faces the wall with his hands raised, he is patted down. |
| 9:40:37 | Plaintiff drops his hands and places them behind his back. |
| 9:40:49 | Plaintiff turns and is escorted through the pod by two officers. |
| 9:41:10 | The escort exits the camera's view. |

[C124 Green North Housing Video].

Footage from September 2, 2022 reflects the following events from the elevator:

| | |
|---|---|
| 09:42:04 | Plaintiff is escorted onto the elevator with one officer on each side of him, and two additional officers. |
| 09:42:08 | Plaintiff is guided to stand in the corner. The officers maintain at least a forearm's distance between their bodies and Plaintiff's. |
| 09:42:45 | The elevator door opens and Plaintiff is escorted out. |
| 09:42:48 | Plaintiff's hands are visible, cuffed behind him, with his palms facing upwards and slightly towards each other. |

[C95 Blue Elevator Video].

Video footage from the housing pod on April 16, 2023 reflects the following:

| | |
|---|---|
| 2:50:01 | Plaintiff is seated at a dayroom table with Offender Burnette; piles of clothes are stacked on a nearby shower wall. |
| 2:51:21 | Plaintiff and Burnette begin conversing. |
| 2:51:28 | Plaintiff appears to reach into his right pants pocket. |
| 2:51:32 | Burnette looks down to the Plaintiff's pocket area, then reaches his left hand below the table where it is blocked from the camera's view. |
| 2:51:37 | Burnett places his right hand under the table and appears to be manipulating something. |
| 2:51:39 | Burnett places both hands back on top of the table. |
| 2:54:59 | Plaintiff stands up from the table and walks over to the shower wall. |
| 2:55:05 | Plaintiff starts sorting through a pile of clothing. |

11

| | |
|---|---|
| 2:55:10 | Burnette stands from the table and walks over to the water fountain right beside Plaintiff; the two converse with their heads down. |
| 2:55:18 | Burnette and Plaintiff appear to make a hand-to-hand exchange. |
| 2:55:20 | Burnette reaches into his left pants pocket as Plaintiff continues sorting clothing. |
| 2:55:25 | Plaintiff turns and walks away; Burnette remains at the water fountain. |
| 2:55:32 | Plaintiff sits back down at the table. |
| 2:55:36 | Plaintiff again reaches into his pants pocket. |
| 2:55:42 | Burnette leaves the water fountain holding a cup, and walks to the wall phone a short distance away where he makes a phone call. |
| 2:57:26 | A slider door opens, an officer leans through the doorway and summons Burnette. |

[C133 Green South D Wing #2 Video].

## IV.    DISCUSSION

### A.    Exhaustion

The Prison Litigation Reform Act ("PLRA") requires a prisoner to exhaust his administrative remedies before filing a § 1983 action.  42 U.S.C. § 1997e(a).  The PLRA provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." Id.  In Porter v. Nussle, the Supreme Court held that the PLRA's exhaustion requirement applies to all inmate suits about prison life. 534 U.S. 516, 532 (2002).  The Court ruled that "exhaustion in cases covered by § 1997e(a) is now mandatory." Id. at 524 (citation omitted).  The Porter Court stressed that, under the PLRA, exhaustion must take place before the commencement of the civil action to

12

further the efficient administration of justice.  Id.

In Woodford v. Ngo, the Supreme Court held that the PLRA exhaustion requirement requires "proper" exhaustion: "Administrative law ... requir[es] proper exhaustion of administrative remedies, which 'means using all steps that the agency holds out, and doing so properly (so that the agency addresses the issues on the merits).'" 548 U.S. 81, 90 (2006) (quoting Pozo v. McCaughtry, 286 F.3d 1022, 1024 (7th Cir. 2002)).  Further, "[t]here is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211 (2007) (citing Porter, 534 U.S. at 524).  Because exhaustion of administrative remedies is an affirmative defense, defendants have the burden of pleading and proving lack of exhaustion.  Id. at 216.

The North Carolina Department of Adult Corrections ("NCDAC")[18] has established a three-step procedure governing submission and review of inmate grievances in its Administrative Remedy Procedure ("ARP").  Moore v. Bennette, 517 F.3d 717, 721 (4th Cir. 2008).  Inmates are required to "properly" exhaust administrative remedies in accordance with ARP.  Woodford, 548 U.S. at 90; Moore, 517 F.3d at 726.  An inmate does not exhaust his administrative remedies until he completes all three steps of the ARP.  Moore, 517 F.3d at 726.

A prison official has the burden to prove an inmate's failure to exhaust available administrative remedies.  Jones, 549 U.S. at 216. Once a defendant presents evidence of a failure to exhaust, the burden of proof shifts to the inmate to show, by a preponderance of the evidence, either that exhaustion occurred or that administrative remedies were unavailable.  Graham v. Gentry, 413 F. App'x 660, 663 (4th Cir. 2011).

The Defendants have forecast evidence that the Plaintiff did not address Parlier's alleged

---

[18] Previously known as the North Carolina Department of Public Safety (NCDPS).

harassment on September 29, 2021 and the following days in a fully exhausted grievance. [Doc. 70-16: Grande Decl. at ¶¶ 10-11; Doc. 70-28: Byrd Decl. at ¶ 8; Doc. 70-34 (Grievance No. 4870-2022-LOPDC-00052); id. at 4 (screening rejection as untimely)]. The Plaintiff has forecast evidence that he attempted to file a timely grievance on December 28, 2021, but that it was intentionally held by staff until after the 90-day time limit had expired. [Doc. 1: Compl. at ¶ 105]. The Plaintiff has presented adequate evidence that exhaustion was unavailable, accordingly, the Defendants' Motion for Summary Judgment for lack of exhaustion regarding Parlier's alleged harassment on September 29 and the following days will be denied.

As to the incidents of September 2, 2022, the Defendants have forecast evidence that the Plaintiff fully exhausted his allegations only as to Defendant Parlier, and not as to Defendant Carroll. [See Doc. 70-26 (Grievance No. -19397)]. The Plaintiff has not forecast any evidence that he exhausted his allegations of Carroll's misconduct on September 2, or that the grievance procedure was unavailable to him. Accordingly, summary judgment will be granted on the claims against Defendant Carroll on September 2, 2022, for lack of exhaustion.

As to the incidents of April 16 and 17, 2023, the Defendants concede that Plaintiff's claims against Defendant Carroll are fully exhausted.[19] [See Doc. 70 at 13; see Doc. 70-27 (Grievance No. -00937)].

The Defendants' Motion for Summary Judgment will, therefore, be granted for lack of exhaustion as to Defendant Carroll's alleged Eighth Amendment violations on September 2, 2022, but it will be denied in all other respects with regards to exhaustion.

**B.      Merits**

**1.      Eighth Amendment**

---

[19] The Plaintiff does not dispute that Defendant Parlier no longer worked at the Alexander CI at that time.

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments," U.S. CONST. amend. VIII, and protects prisoners from the "unnecessary and wanton infliction of pain." Whitley v. Albers, 475 U.S. 312, 319 (1986).  To establish an Eighth Amendment claim, an inmate must satisfy both an objective component–that the harm inflicted was sufficiently serious–and a subjective component–that the prison official acted with a sufficiently culpable state of mind. Williams v. Benjamin, 77 F.3d 756, 761 (4th Cir. 1996).  In adjudicating an excessive force claim, the Court must consider such factors as the need for the use of force, the relationship between that need and the amount of force used, the extent of the injury inflicted, and, ultimately, whether the force was "applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically for the very purpose of causing harm."  Whitley, 475 U.S. at 320-21. Furthermore, the Supreme Court has made clear that "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape without serious injury."  Wilkins v. Gaddy, 559 U.S. 34, 38 (2010). However, the extent of an injury suffered by the plaintiff is "one factor that may suggest 'whether the use of force could plausibly have been thought necessary' in a particular situation," and "may also provide some indication of the amount of force applied." Id. at 37 (quoting Whitley, 475 U.S. at 321).

The forecast of evidence demonstrates that Defendant Parlier banged the cuffs onto Plaintiff's wrists and squeezed them tightly at approximately 9:40 a.m. on September 2, 2022, after the Plaintiff refused several direct orders. The Plaintiff complained about the tight cuffs, and he was seen by a nurse by 9:52 a.m., at which time he had a red mark and tenderness to his left wrist. The nurse asked that the cuffs be loosened so that the Plaintiff could be examined, however, Defendant Carroll refused. By the time Plaintiff visited medical two days later, he had no signs of pain or injury. He did not complain about his hand or wrist again for several months, at which

15

point he received an x-ray which was normal.

These facts, viewed in the light most favorable to the Plaintiff, do not demonstrate the existence of a genuine dispute regarding excessive force. The initial application of cuffs was appropriate in light of the Plaintiff's admitted refusal of direct orders. Although the Plaintiff has forecast evidence that the cuffs were too tight and that Parlier failed to immediately loosen them, the objective evidence demonstrates that the cuffs remained untended for, at most, 12 minutes before Plaintiff received medical attention, at which time he had only a red mark and tenderness. The decision not to loosen the cuffs at that point was Carroll's and cannot be attributed to Parlier.[20] The forecast of evidence further reflects that the Plaintiff appeared uninjured and pain-free two days later, he did not complain again for nearly two months and, when he did, an x-ray was normal.

The Plaintiff's attempt to assign liability to Parlier for his present carpal tunnel difficulties is unavailing. The forecast of evidence demonstrates that he had hand and wrist pain prior to the September 2 tight cuffing incident. After the incident, an x-ray was normal on October 2022, and the Plaintiff did not complain about hand or wrist pain for more than a year until December 8, 2023. When the Plaintiff saw an outside orthopedic specialist in September 2024, he complained of bilateral numbness and tingling for a year and a half, i.e., since approximately March 2023, which does not coincide with the September 2, 2022 incident. Plaintiff's reliance on this unrelated diagnosis to bolster his excessive force claim against Parlier fails to demonstrate the existence of a genuine dispute of material fact as to Parlier's use of excessive force on September 2.

No reasonable jury could find, based on the forecast of evidence and the relevant factors, that Defendant Parlier's placement of tight handcuffs after Plaintiff disobeyed at least two direct orders, and his refusal to loosen them for just 12 minutes, causing only tenderness and a red mark,

---

[20] As noted *supra*, the Plaintiff failed to exhaust his claims that Carroll violated the Eighth Amendment.

was objectively sufficiently serious. See Wilkins, 559 U.S. 37.

Next, the Plaintiff's forecast of evidence that Defendant Parlier shoved him repeatedly into his cell, snatched him from the wall then speed-walked and tugged him so that he tripped, and leaned his body into Plaintiff's in the elevator, is so blatantly contradicted by the video footage that no reasonable jury could believe it. See Scott, 550 U.S. at 380.

The Plaintiff's forecast of evidence that Defendant Parlier engaged in verbal harassment on several occasions is insufficient to defeat the Motion for Summary Judgment on Plaintiff's Eighth Amendment claim. See generally Henslee v. Lewis, 153 F.App'x 178 (4th Cir. 2005) ("Mere threats or verbal abuse by prison officials, without more, do not state a cognizable claim under § 1983"); see, e.g., Caldwell v. Carroll, No. 5:24-cv-00096-MR, 2024 WL 1979453, at *3 (W.D.N.C. May 2, 2024) (the law is well-established that taunting comments, slurs, threats, and other verbal harassment by correctional facility staff, without more, are not actionable under § 1983); Wilson v. United States, 332 F.R.D. 505, 520 (S.D.W.Va. Aug. 19, 2019) (collecting cases). Plaintiff's forecast of evidence that Parlier delivered contaminated food, which the Plaintiff did not eat, is also insufficient. See Farmer v. Brennan, 511 U.S. 825, 837 (1994) (to violate the Eighth Amendment, an official must know of and disregard an excessive risk to inmate health or safety); Strickler v. Waters, 989 F.2d 1375, 1381 (4th Cir. 1993) (a "serious or significant physical or emotional injury" must have resulted from the challenged conditions).

The Defendants' Motion for Summary Judgment will, therefore, be granted on Plaintiff's Eighth Amendment claims against Defendant Parlier.[21]

---

[21] Summary judgment would also be warranted on the basis of qualified immunity because there is no material dispute regarding a violation of Plaintiff's Eighth Amendment rights. See generally Henry v. Purnell, 652 F.3d 524, 531 (4th Cir. 2011) (en banc); E.W. ex rel. T.W. v. Dolgos, 884 F.3d 172, 178 (4th Cir. 2018). Because there is no genuine dispute as to Parlier's violation of Plaintiff's Eighth Amendment rights, Plaintiff's claims against Defendant Carroll for failure to intervene and supervisory liability would fail were they exhausted. See Phillips v. Bailey, 337 F.Supp.2d 804, 807 (W.D. Va. 2004) ("there can be no supervisory liability where there is no underlying violation of the Constitution") (collecting cases); Diamond v. Odedere, No. 1:22-cv-287, 2024 WL 230113 (M.D.N.C. Jan. 22, 2024)

17

## 2. Retaliation

An inmate has a clearly established First Amendment right to be free from retaliation for filing lawsuits. See Booker v. S.C. Dep't of Corrs., 855 F.3d 533, 540 (4th Cir. 2017); Thompson v. Commonwealth of Va., 878 F.3d 89, 110 (4th Cir. 2017). Inmates also have a protected right to complain to prison officials about prison conditions and improper treatment by prison employees that affect them. See Patton v. Kimble, 717 Fed. App'x 271, 272 (4th Cir. 2018).

To prevail on a retaliation claim, a plaintiff must prove that (1) he engaged in protected First Amendment activity, (2) the defendant took some action that adversely affected his First Amendment rights, and (3) there was a causal relationship between his protected activity and the defendant's conduct. Martin v. Duffy, 977 F.3d 294, 299 (4th Cir. 2020) (quotation marks and citation omitted). For purposes of a First Amendment retaliation claim under § 1983, a plaintiff suffers an adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights. Jones v. Solomon, 90 F.4th 198, 214 (4th Cir. 2024). The "same-decision test" applies to determining the causation element of a prisoner's retaliation claim. Martin, 977 F.3d at 299. Once the prisoner-plaintiff shows that his "protected conduct was a substantial motivating factor in a prison guard's decision to take adverse action," the burden then shifts to the defendant to prove a permissible basis for taking that action. Id. at 300. For a plaintiff to meet his prima facie burden of causation, he must show "(1) that the defendant was aware of [his] engaging in protected activity" and (2) "some degree of temporal proximity to suggest a causal connection." Shaw v. Foreman, 59 F.4th 121, 130-31 (4th Cir. 2023) (quoting Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 501 (4th Cir. 2005)). Bare or conclusory assertions of retaliation are insufficient to establish a

(where plaintiff did not come forward with evidence sufficient to support a determination by a reasonable factfinder that defendant used excessive force against plaintiff, the claim for failure to intervene failed as a matter of law).

18

retaliation claim. <u>Adams v. Rice</u>, 40 F.3d 72, 74 (4th Cir. 1994).

The forecast of evidence demonstrates that the Plaintiff exercised his First Amendment rights by complaining about Parlier on multiple occasions beginning on September 28, 2021 after Parlier ransacked his cell, and again on September 2, 2022 when he objected to Parlier's involvement in a search. <u>See</u> <u>Booker v. S. Carolina Dep't of Corr.</u>, 855 F.3d 533, 542 (4th Cir. 2017) (noting that inmates have a First Amendment claim alleging retaliation in response to his verbal complaints to prison officials). The Plaintiff has forecast evidence that Defendant Parlier engaged in adverse action shortly after each of these incidents by, inter alia, delivering the Plaintiff contaminated food while calling him a "snitch," and by applying tight handcuffs, which he refused to loosen, while using foul language.[22] The Plaintiff's protected activity in each instance occurred in close temporal proximity to allegedly threatening comments and physical acts which, when taken together in the specific circumstances of this case, demonstrate the existence of a genuine dispute of material fact regarding Defendant Parlier's retaliation. The Motion for Summary Judgment will, therefore, be denied on Plaintiff's retaliation claims against Defendant Parlier.

As to the April 2023 incident, the Plaintiff has forecast evidence that Defendant Carroll placed him in restricted housing after Plaintiff said that he would be filing a grievance for harassment. While the forecast of evidence suggests a penological justification for placing the Plaintiff in restricted housing while a disciplinary investigation was conducted, the disciplinary action was dismissed by April 27, 2023. The Plaintiff has forecast evidence that Carroll retained him in restricted housing for at least another week, without any penological justification. <u>See</u>

---

[22] That the tight cuffing did not rise to an Eighth Amendment level does not defeat Plaintiff's retaliation claim based, in part, on the same conduct. Whether the adverse acts would deter a person of ordinary firmness from exercising their rights does not require a separate constitutional violation. <u>See</u> <u>Flemming v. King</u>, No. 14-cv-316, 2016 WL 5219995, at *5 (N.D.N.Y. June 20, 2016) ("[T]he alleged assault need not rise to the level of an Eighth Amendment excessive force violation in order to be considered an adverse action for purposes of First Amendment retaliation analysis"), *rec. adopted*, 2016 WL 5173282 (N.D.N.Y. Sept. 21, 2016).

19

Gowen v. Winfield, 130 F4th 162, 173 (4th Cir. 2025) ("Placement in solitary confinement isolation is an adverse action"). There is a genuine dispute of material fact as to Defendant Carroll's retaliation, accordingly, summary judgment will likewise be denied as to him.

Because there are genuine factual disputes regarding the Defendants' alleged retaliation, The existence of genuine disputes of material fact regarding the Defendants' retaliation precludes summary judgment on the basis of qualified immunity. See generally King v. Blackwood, __ F.4th __, 2026 WL 1902547 (4th Cir. July 2, 2026) (concluding that the defendants were not entitled to qualified immunity where the district court found genuine disputes regarding the defendants' deliberate indifference to a serious medical need).

## IV.     CONCLUSION

For the reasons stated herein, the Defendants' Motion for Summary Judgment is granted in part and denied in part.  The Court intends to refer the surviving retaliation claims to a magistrate judge for a judicial settlement conference.

### ORDER

**IT IS, THEREFORE, ORDERED** that:

1.  The Defendants' Motion for Summary Judgment [Doc. 69] is **GRANTED IN PART AND DENIED IN PART.** Specifically, the Defendants' Motion is **DENIED** with respect to the Plaintiff's retaliation claims and it is **GRANTED** as to the Plaintiff's Eighth Amendment claims as described in this Order.

2.  The Eighth Amendment claims against Defendant Parlier are **DISMISSED WITH PREJUDICE** and the Eighth Amendment claims against Defendant Carroll are **DISMISSED WITHOUT PREJUDICE** as unexhausted.

20

3.  The parties shall notify the Court within **fourteen (14) days** of this Order whether they object to a judicial settlement conference in this matter.

**IT IS SO ORDERED.**

Signed: July 20, 2026

Max O. Cogburn Jr
United States District Judge